**Exhibit 1**

<u>**NOTICE OF AUCTION**</u>

<u>**AUCTION AND SALE PROCEDURES**</u>[1]

       **PLEASE TAKE NOTICE THAT,** pursuant to the Order of the Court entered on December __, 2014 (the "<u>Auction Order</u>"), by the United States Bankruptcy Court for the Eastern District of New York in connection with the Chapter 7 case of Long Island Banana Corp. (the "<u>Debtor</u>"), styled *In re Long Island Banana Corp.,* Chapter 7 Case No. 14-71443 (REG) (the "<u>Bankruptcy Case</u>"), and subject to the terms and conditions set forth below, an auction sale ("<u>Auction</u>") of (1) the disposition of the Debtor's interest in a certain lease (the "<u>Lease</u>") of nonresidential real property located at 28 Williams Street, Lynbrook, New York (the "<u>Premises</u>"); (2) sale of the Debtor's refrigeration units located at the Premises (*i.e.,* the "<u>Ripening Rooms</u>" and together with the Lease, the "<u>Assets</u>"); and (3) at the discretion of the Trustee, the sale of other assets as described and on terms and conditions set forth below (the "<u>Other Assets</u>"), will be conducted on **December 18, 2014 at 11:00 a.m. (Eastern Time) at the offices of Westerman Ball Ederer Miller Zucker & Sharfstein, LLP, 1201 RXR Plaza, Uniondale, New York 11556**.  The Auction shall be live and in person.  The Auction shall be governed by the following procedures:

<u>**Background**</u>

       1.     The Debtor filed a voluntary Chapter 11 petition on April 3, 2014 (the "<u>Filing Date</u>"). By Order entered on October 16, 2014, the Debtor's case was converted to a case under Chapter 7 of the Bankruptcy Code (the "<u>Conversion Order</u>").

       2.     R. Kenneth Barnard, Esq. (the "<u>Trustee</u>") has been appointed the Chapter 7 trustee and has duly qualified in that capacity.

       3.     At a hearing held in the Bankruptcy Case on September 11, 2014 (the "<u>September 11 Hearing</u>"), the Debtor and its landlord, 28 William Street Corp. ("<u>Landlord</u>"), set forth on the record the resolution of various disputes between the Debtor and Landlord related to that certain fifteen (15) year written lease, including the rider to lease (the "<u>Rider to Lease</u>"), effective as of January 1, 2003 (collectively, the "<u>Original Lease</u>"), concerning the Premises.  The settlement was supposed to, among other things, establish December 31, 2014 as the deadline for the Lease to be assumed or rejected; fix the cure amount; establish the agreed upon rental amounts due going forward; replace the personal guaranty provision with a security deposit; extend the term by granting additional "Renewal Option" periods; and otherwise resolve issues and settle matters in the pending litigation between Landlord and the Debtor concerning, among other things, real estate taxes, utilities and alleged defaults.

       4.     As the Trustee and Landlord attempted to memorialize in an amendment to the Lease the agreement set forth at the September 11 Hearing, it became apparent that the record of the September 11 Hearing was ambiguous and the Trustee and Landlord were in disagreement with respect to certain salient terms.  For example, while the Trustee understood that Landlord

---

[1]     As revised pursuant to that certain hearing held on December 3, 2014 before the United States Bankruptcy Court for the Eastern District of New York (the "<u>Auction Procedures Hearing</u>").

agreed to resolve all disputes, including amounts due as a cure payment, by agreeing, among other things, to accept a cure payment of $100,000.00 in all events, Landlord indicated that the $100,000.00 cure amount was and is only acceptable if the Lease were to be assumed by the Debtor, without assignment, or assumed and assigned to All Island Banana Corp. (a post-petition secured creditor of and debtor-in-possession lender to the Debtor, "All Island"), noting Landlord's reservation of all of its rights pursuant to section 365 of the Bankruptcy Code with respect to any assignment of the leasehold interest to another third party (an amount that was estimated by Landlord to be in the neighborhood of $400,000.00).

5.      The Trustee and Landlord resolved this cure amount dispute by agreeing, among other things, that the cure amount is (a) $100,000.00 if the Debtor assumes and retains the Lease, or if the Lease is assumed and assigned to All Island, and (b) Landlord will accept $200,000.00 as a cure amount in the event the Lease is assumed and assigned to any other party (and subject to adequate assurance of future performance in accordance with section 365 of the Bankruptcy Code).

6.      In addition, the transcript of the September 11 Hearing was unclear on the agreed upon term of the Lease, *i.e.,* whether there are two or three remaining Renewal Options to be exercised. Landlord and the Trustee resolved this ambiguity by agreeing that the current term has approximately 3 years and 3 month remaining after September 11, 2014, with three (3) additional five-year Renewal Options exercisable in accordance with the terms of the Amendment (defined below).

7.      On December 2, 2014, in advance of the Auction Procedures Hearing, the Trustee filed a Stipulation and Order authorizing Esposito to submit a Stalking Horse Bid for the Assets in the amount of $425,000.00 provided, that if Esposito did not become the Successful Bidder or the Successful Back-Up Bidder, then Esposito would be entitled to $15,000.00 as a Break-Up Fee.

8.      At the Auction Procedures Hearing, the Landlord agreed to accept as part of the cure amount at Closing the December rent due in the amount of $17,000.00, subject to a reservation of rights to assert a priority claim for such amount pursuant to 11 U.S.C. §506(c) and an administrative expense claim in the event the Assets are not sold at Auction, subject to a reservation of rights of all parties to oppose any such claim. The Court also approved the Break-Up Fee as against all parties that may become the Successful Bidder or Successful Back-up Bidder other than All Island.

9.      To summarize, Landlord and the Trustee have agreed to the amend the terms of the Original Lease by way of an amendment (the "Amendment"), the salient provisions of which are as follows, among others:

- Lease Term:  The initial term extends through and including December 2017, with three (3) additional five-year Renewal Options available to Tenant as set forth in the Amendment;

- Cure Amount:    (a) $100,000.00, if the Lease is assumed and retained by the Debtor, or assumed and assigned to All Island plus December rent of $17,000.00 for a

total of $117,000.00; and (b) $200,000.00 if the Lease is assumed and assigned to any other third party plus December rent of $17,000.00 for a total of $217,000.00;

- Security Deposit:  In lieu of a good-guy or other guaranty, a security deposit in the amount of $75,000.00 (the "Security Deposit") shall be posted and delivered to Landlord at the time of assumption and/or assignment of the Lease.  If there are no uncured defaults at the end of the first year of posting the security deposit, Tenant shall receive a rebate of a portion of the security deposit in the amount of $25,000.00. If there are no uncured defaults at the end of the second year of posting the security deposit, Tenant shall receive another rebate of a portion of the security deposit in the amount of $15,500.00, leaving $34,500 as the remaining amount of the security deposit;

- Adequate Assurance of Future Performance:     All Island is deemed by Landlord to have provided adequate assurance as required by section 365 of the Bankruptcy Code, such that the Debtor and All Island are approved assignees of the Lease.  Any other third party seeking to acquire the Lease must provide adequate assurance of future performance in accordance with section 365 of the Bankruptcy Code.

- Assumption and Assignment:   All Island is already an approved assignee. Accordingly, subject to there being an economic benefit to the Debtor's estate, if All Island is the successful bidder, so long as the $117,000 cure amount is timely paid and the $75,000 Security Deposit is timely delivered, the Lease can be assumed and assigned to All Island.  Alternatively, if the Trustee seeks to assume and assign the Lease to any other third party, subject to there being an economic benefit to the Debtor's estate, such third party would need to timely (a) pay a cure amount of $217,000, (b) post the $75,000 Security Deposit, and (c) provide adequate assurance of future performance, as required by Section 365(b)(1)(C).  If these 3 conditions are met by a third party that proves to be the successful bidder, the Lease may be assumed and assigned to such third party.

10.     At the Auction Procedures Hearing, it was also determined that the Trustee would be authorized to sell certain other assets, including but not limited to (a) machinery, equipment (including hi-los and electric hand jacks), office furniture and office equipment, located at the Premises, and (b) customer lists, exclusive use of the trade name Long Island Banana and all other intellectual property, trademarks, domain names, telephone numbers, fax numbers and e-mail addresses (collectively, the "Other Assets"), subject to the rights and remedies of all parties in interest, including the Trustee, All Island, PACA Claimants and Citibank N.A. to assert liens, claims, encumbrances or other entitlements in and to the Other Assets.

**Auction and Sale Procedures**.

1.    **Determination of "Qualified Bidder" Status**.  Any potential bidder who wishes to participate in the Auction (as hereinafter defined) and to bid to acquire the Assets must be a "Qualified Bidder".  A Qualified Bidder is a potential bidder who, *on or before December 16, 2014 at 3:00 p.m. (Eastern Time)* (the "Qualified Bidder Deadline")*,* delivers so as to be actually received by such date and time, to (a) counsel to the Chapter 7 Trustee R. Kenneth Barnard, Esq., c/o Westerman Ball Ederer Miller Zucker & Sharfstein, LLP, 1201 RXR Plaza, Uniondale, New York 11556, Attn.: Thomas A. Draghi, Esq.; with a copy to (b) counsel to 28 Williams Street Corp., the Debtor's Landlord, c/o LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Wantagh, New York 11793, Attn.: Joseph Maniscalco; and (c) David R. Maltz, & Co., Inc., the Trustee's Auctioneer, 39 Windsor Place, Central Islip, New York, 11722, Attn: Richard Maltz, a written submission that:

(a)    fully discloses the identity of the person or entity that will be bidding for the Assets (the "Bidder") or otherwise participating in connection with such bid on behalf of the Bidder, and the terms of any such participation;

(b)    states that the Bidder is financially able and interested in acquiring the Assets for a cash price of not less than the "Minimum Bid" (defined below), without contingencies as to financing and/or additional due diligence (it being understood, however, that the Bidder, while bound to its bid, shall not be deemed to have made an offer to acquire the Assets binding upon the Trustee prior to the time that the Auction is conducted and the sale approved by the Court);

(c)    to the extent the Bidder seeks to include a bid for any Other Assets, fully identifies the Other Assets sought as part of the Bid and ascribes a dollar amount for the purchase of such Other Assets;

(d)    is accompanied by financial information (including without limitation, audited and unaudited financial statements, tax returns, bank account statements or any other documentation) which fairly and reasonably demonstrates the Bidder's ability (and the sources of the Bidder's ability) to (1) immediately consummate the transactions contemplated in the Bidder's bid; and (2) perform the obligations contained in the Lease going forward including evidence of adequate assurance of future performance by the Bidder (other than All Island, which is deemed to have satisfied this requirement) should such Bidder be the Successful Bidder (as hereinafter defined);

(e)    is accompanied by evidence that a deposit in the amount of **$25,000.00** (the "Deposit") has been made (or is concurrently being made) in the form of (i) a certified check, federal funds, or an official bank check issued by a bank with offices on Long Island or in the City of New York made payable to Westerman Ball Ederer Miller Zucker & Sharfstein, LLP, as escrow agent (the "Escrow Agent"), or (ii) a wire transfer to the Escrow Agent in accordance with wire instructions that will be provided on request, which Deposit shall be held in escrow in a non-interest bearing escrow account by the Escrow Agent in accordance with the terms hereof;

(f)        agrees in writing to close on the purchase of the Assets (and Other Assets, if applicable) if  the Qualified Bidder's bid at the Auction is selected as the Successful Bid (as hereinafter defined), immediately after the Auction results are approved by the Bankruptcy Court on a date and time to be determined in the discretion of the Trustee, which shall occur in all events **by no later than December 30, 2014,** or on such other date as the Trustee, Landlord, and the Successful Bidder shall otherwise agree to in writing, or as may otherwise be established in accordance with the terms hereof (such date, the "Closing Date"), with **TIME BEING OF THE ESSENCE AS TO THE SUCCESSFUL BIDDER'S OBLIGATION TO CLOSE ON THE CLOSING DATE AND TO PAY THE BALANCE OF THE PURCHASE PRICE AND DELIVER THE SECURITY DEPOSIT (IN THE AMOUNT OF $75,000.00) TO LANDLORD AT THE CLOSING**;

(g)        agrees in writing that if such Bidder is determined by the Trustee to have submitted the second highest bid at the Auction (the "Back-up Bid") and, therefore, to be the back-up bidder (the "Back-up Bidder"), and the Trustee determines to proceed with the Back-up Bid after default by the Successful Bidder, to close on the purchase of the Assets  (and Other Assets, if applicable) on a date and time to be determined in the discretion of the Trustee, which shall occur in all events **by no later than December 30, 2014**, or on such other date as the Trustee, Landlord, and the Back-up Bidder shall otherwise agree to in writing, or as may otherwise be established in accordance with the terms hereof (such date, the "Back-up Closing Date"), with **TIME BEING OF THE ESSENCE AS TO THE BACK-UP BIDDER'S OBLIGATION TO CLOSE ON THE BACK-UP CLOSING DATE AND TO PAY THE BALANCE OF THE PURCHASE PRICE AND DELIVER THE SECURITY DEPOSIT (IN THE AMOUNT OF $75,000.00) TO LANDLORD AT THE CLOSING;**

(h)        agrees in writing that if such Bidder (i) is the Successful Bidder, that the Deposit shall become non-refundable if the Bidder's bid at the Auction is selected as the Successful Bid and shall be forfeited by such Successful Bidder as liquidated damages if the Successful Bidder shall fail to close the purchase for any reason whatsoever on the Closing Date (other than for failure of the Trustee to execute and deliver documents necessary to assign the Assets and Other Assets, if applicable); and (ii) is the Back-up Bidder and the Trustee determines to proceed with the Back-up Bid after default by the Successful Bidder, that the Deposit shall become non-refundable and shall be forfeited by such Back-up Bidder as liquidated damages if the Back-up Bidder shall fail to close the purchase for any reason whatsoever on the Back-up Closing Date (other than for failure of the Trustee to execute and deliver documents necessary to assign the Assets);

(i)        with respect to such Successful Bidder other than All Island and Esposito, agrees to pay the Break-Up Fee; and

(j)        agrees to these Auction Sale Procedures by signing and delivering an executed original of this document at or prior to the commencement of the Auction to counsel for the Trustee and counsel for Landlord.

2.        **Minimum Bid**.        As noted above, Esposito has submitted a Stalking Horse Bid in the amount of $425,000.00.  (a) for Bidders other than All Island, "Minimum Bid"

above the Stalking Horse Bid means a Bid of not less than **$450,000.00** (which amount includes the Cure Amount of $200,000.00 due to Landlord, plus December Rent of $17,000.00, the Break-up Fee of $15,000.00, $10,000.00 as the initial bid increment required by section 4(c) below, other sums to cover anticipated taxes attributable to the sale transaction, commissions and expenses for the Auctioneer, plus some funds for the estate; and (b) for All Island, "Minimum Bid" means **$335,000.00** (reflecting that the Cure Amount for All Island is $100,000.00 and All Island is not responsible for the Break-up Fee).  **NOTE, the Minimum Bid does NOT include the Security Deposit in the amount of $75,000.00 which the Successful Bidder will be required to separately post and deliver to Landlord at the Closing.**

3.   **Auction.**  The Auction will be conducted on **December 18, 2104 at 11:00 a.m. (Eastern Time) at the offices of Westerman Ball Ederer Miller Zucker & Sharfstein, LLP, 1201 RXR Plaza, Uniondale, New York 11556**.  The Auction shall be live and in person. The Auction shall be governed by the following procedures:

(a)   Only representatives of the Trustee, Landlord, All Island, Esposito, Qualified Bidders, counsel to Citibank, N.A. and counsel to the PACA creditors who have appeared in the Bankruptcy Case, and their respective agents and designated representatives may participate at the Auction, and only such parties, the auctioneer appointed by Order of the Bankruptcy Court in the Bankruptcy Case and a stenographer may be present throughout the Auction;

(b)   Only Qualified Bidders shall be entitled to make any subsequent bids at the Auction;

(c)   Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

(d)   Qualified Bidders may make successive bids in increments of at least $10,000.00 higher than the bid at which the Auction commenced and then continue in minimum increments of at least $5,000.00 higher than the previous bid; *provided* the Trustee, after consultation with the Auctioneer, is authorized to modify such bid increments;

(e)   The Auction shall continue until there is only one offer that the Trustee determines is the highest and best offer submitted at the Auction from among the Qualified Bidders (the "Successful Bid");

(f)   If more than one Qualified Bidder submits a bid in excess of the Stalking Horse Bid, then, after selection of the Successful Bidder, the Trustee shall determine which such Qualified Bid constitutes the Back-up Bid;

(g)   In considering bids submitted by Qualified Bidders at the Auction, the Trustee may request that Qualified Bidders provide for review by the Trustee and Landlord at the Auction financial information which fairly and reasonably demonstrates the Bidder's ability (and the sources of the Bidder's ability) to close on its purchase of the Assets and, for all Bidders

other than All Island, adequate assurance of future performance under the Lease if the Bidder should be the Successful Bidder based upon the bids submitted at the Auction;

(h)     Deposits submitted by Qualified Bidders who do not become the Successful Bidder or Back-up Bidder shall be returned by the Escrow Agent to such Qualified Bidders within two (2) Business Days after the Auction, except as otherwise provided herein;

(i)     Bids at the Auction must be all cash, without financing or other contingencies; and

(j)     The Trustee shall convey the Assets (and Other Assets, if applicable) by delivery of a sale agreement in form acceptable to the Trustee, as is where is, without covenants.

     4.    **Obligation to Close and Default**.  (a) The Successful Bidder (or, upon consent granted by the Trustee and Landlord in writing at or prior to the Closing, an assignee of the Successful Bidder) shall close on the purchase of the Assets (and Other Assets, if applicable) and pay the amount of the Successful Bid, less its Deposit previously posted, in immediately available funds to the Trustee via wire instructions to be provided by the Trustee in advance of the Closing Date, **to be actually received by no later than 10:00 a.m. E.S.T. on the Closing Date, with TIME BEING OF THE ESSENCE AS TO THE SUCCESSFUL BIDDER'S OBLIGATION TO CLOSE ON THE CLOSING DATE AND TO PAY THE BALANCE OF THE PURCHASE PRICE AND DELIVER THE SECURITY DEPOSIT (IN THE AMOUNT OF $75,000.00) TO LANDLORD AT THE CLOSING**.  There is no contingency of any kind or nature that will permit the Successful Bidder not to proceed at the Closing other than the inability of the Trustee to deliver title to the Assets.  In the event the Successful Bidder shall fail to timely close the purchase of the Assets, the Successful Bidder shall be in default and the Successful Bidder shall forfeit its Deposit.

     (b)    If for any reason the Successful Bidder shall fail to timely close the sale of the Assets (and Other Assets, if applicable) and the Trustee determines to proceed with the Back-up Bid, the Back-up Bidder (or, upon consent granted by the Trustee and Landlord in writing at or prior to the Back-up Closing Date, an assignee of the Back-up Bidder) shall close on the purchase of the Assets and pay the amount of the Back-up Bid, less its Deposit previously posted, in immediately available funds to the Trustee via wire instructions to be provided by the Trustee in advance of the Closing Date, **to be actually received by no later than 10:00 a.m. E.S.T. on the Closing Date, with TIME BEING OF THE ESSENCE AS TO THE BACK-UP BIDDER'S OBLIGATION TO CLOSE ON THE BACK-UP CLOSING DATE AND TO PAY THE BALANCE OF THE PURCHASE PRICE AND DELIVER THE SECURITY DEPOSIT (IN THE AMOUNT OF $75,000.00) TO LANDLORD AT THE CLOSING**.  If the Debtor proceeds with the Back-up Bid then the Back-up Bidder shall be obligated to close and there shall be no contingency of any kind or nature that will permit the Back-up Bidder not to proceed on the Back-up Closing Date other than the inability of the Trustee to deliver title to the Assets (and Other Assets, if applicable).  In the event the Back-up Bidder shall be obliged, but shall fail, to timely close the purchase of the Assets, the Back-up Bidder shall be in default and the Back-up Bidder shall forfeit its Deposit.

5.        **Deposits of Successful Bidder and Back-up Bidder**.  (a) The Deposit submitted by the Successful Bidder shall be held in escrow by the Escrow Agent pending the closing of the sale.  The Successful Bidder's Deposit shall be applied to the sale price upon the closing of the sale, unless the Successful Bidder shall default and fail to close and forfeit its Deposit, in which case the Deposit shall be retained by the Trustee for the benefit of the estate and its creditors.

(b)        The Deposit submitted by the Back-up Bidder shall be held in escrow by the Escrow Agent until the Closing; provided, however, if the Successful Bidder fails to close and the Trustee proceeds with the Back-up Bid, then the Back-up Bidder's Deposit shall continue to be held by the Escrow Agent and shall be applied to the sale price upon the closing of the sale on the Back-up Closing Date, unless the Back-up Bidder shall default and fail to close and forfeit its Deposit, in which case the Deposit shall be retained by the Trustee for the benefit of the estate and its creditors.

6.        **Due Diligence**.  Each Bidder is solely responsible for conducting its own due diligence and **must** complete its due diligence prior to the submission of its bid.

7.        **Reservation of Rights**.  In the interest of maximizing the results realized through the Auction, the Trustee reserves the right, in its business judgment, to: (a) modify any of the deadlines set forth in these Auction Sale Procedures; (b) modify or waive, at or prior to the close of the Auction, the procedures and terms and conditions regarding the sale of the Assets; (and Other Assets, if applicable) and/or (c) with the consent of Landlord, adjourn the Auction and/or Closing.

8.        **Additional Terms, Conditions and Procedures**.

(a)        The Debtor's interest in the Assets (and Other Assets, if applicable) is being sold "AS IS", "WHERE IS" in its condition on the Closing Date or the Back-up Closing Date, if applicable, without any representations, covenants, guarantees or warranties by the Trustee of any kind or nature whatsoever, free and clear of any liens, claims or encumbrances of whatever kind or nature (collectively, the "Liens"), with such Liens, if any, to attach to the proceeds of sale, and subject to any Liens, claims or encumbrances of whatever kind or nature thereafter accrued.  Any Liens, claims or encumbrances of whatever kind or nature accruing after the Closing shall be the responsibility of the Entity acquiring the Assets (and Other Assets, if applicable) at the Closing, and not the Trustee or the Debtor's estate.  With respect to the Other Assets, the rights and remedies of all interested  parties, including without limitation All Island, Citibank, PACA Claimants and the Trustee are expressly reserved pending a final hearing and determination with respect to the proceeds of the sale of any Other Assets.

(b)        By signing these Auction Sale Procedures all Bidders acknowledge that they have had the opportunity to review and inspect the Assets (and Other Assets, if applicable) and will rely solely thereon and on their own independent investigation and inspection of the Assets (and Other Assets, if applicable) in making their bid. Neither the Trustee nor any of his representatives including the Auctioneer and counsel retained by the Trustee make any representations or warranties with respect to permissible uses of the Assets (and Other Assets, if applicable) or the Premises that is the subject of the Lease. All Bidders acknowledge that they

have conducted their own due diligence In connection with Assets (and Other Assets, if applicable) and are not relying on any information provided by the Trustee or his professionals.

(c)    Only brokers or auctioneers duly retained by Order of the Bankruptcy Court shall be entitled to compensation and only to the extent provided for in any Order authorizing such retention.

(d)    If the Trustee is unable to deliver the Assets (and Other Assets, if applicable) in accordance with these Auction Sale Procedures for any reason whatsoever, the prospective purchaser will have no recourse against the Trustee, his counsel, or the auctioneer retained by Order of the Bankruptcy Court; provided, however, that a Qualified Bidder in this circumstance shall be entitled to a return of its Deposit.

(e)    It is expressly understood that the Trustee shall not incur any cost or expense whatsoever in connection with the sale of the Assets (and Other Assets, if applicable), except for the fees and expenses of the Trustee's own retained professionals, and the Successful Bidder herewith undertakes to pay any such expense of whatever kind or nature, even those costs and expenses which are payable by the seller pursuant to any law or statute.

(f)    By participating in the Auction, all Bidders consent to the jurisdiction of the Bankruptcy Court to determine such disputes under the Bankruptcy Case.  Any disputes concerning the sale of the Assets (and Other Assets, if applicable) shall be determined by the Bankruptcy Court which shall retain sole and exclusive jurisdiction over all matters relating to the sale contemplated by these Auction Sale Procedures.

(g)    The Sale is subject to final approval by the Bankruptcy Court at a hearing to be held on **December 23 2014 at 10:00 a.m.** before the Honorable Robert E. Grossman, United States Bankruptcy Judge for the Eastern District of New York, in his courtroom located at the United States Bankruptcy Court for the Eastern District of New York, Long Island Division, 290 Federal Plaza, Courtroom 860, Central Islip, New York 11722.

THE UNDERSIGNED BIDDER HEREBY CONSENTS TO AND AGREES TO BE BOUND BY THE FOREGOING AUCTION SALE PROCEDURES:

_____

Print Name of Bidder

_____

Print Name and Title of Authorized
Representative of Bidder

_____

Signature of Authorized Representative

_____

Date:

**Exhibit 2**

## AMENDMENT TO LEASE

**THIS AMENDMENT TO LEASE** (this "Amendment") is made as of and effective the 11th day of September, 2014 (the "Effective Date") by and between 28 William St. Corp., having an address at c/o John Balducci, 15 Percy Williams Drive, East Islip, New York 11730 (the "Landlord) and R. Kenneth Barnard, Esq., the Court appointed Chapter 7 Trustee (the "Trustee") of the estate of Long Island Banana Corp., a New York corporation, having an address at 28 Williams Street, Lynbrook, New York (including any assignee approved by the Court, "Tenant").

## WITNESSETH:

**WHEREAS**, 28 William St. Corp., a New York corporation (the "Landlord"), and Tenant are parties to a fifteen (15) year written Blumberg lease and rider to lease (the "Rider to Lease") effective as of January 1, 2003 (the "Original Lease" and, collectively, as amended by this Amendment, the "Lease"), for approximately 21,000 square feet of warehouse space (the "Demised Premises") in the building located at 28 Williams Street, Lynbrook, New York (the "Building") which ends on December 31, 2017; and

**WHEREAS**, on April 3, 2014 (the "Filing Date"), Long Island Banana Corp. ("LIB" or the "Debtor") filed a voluntary petition for relief commencing this case under Chapter 11 of the Bankruptcy Code; and

**WHEREAS**, the Debtor remained in possession of its assets and in the management of its affairs until the Court converted the case to one under Chapter 7 of the Bankruptcy Code on October 15, 2014 (the "Conversion"); and

**WHEREAS**, R. Kenneth Barnard, Esq. (the "Trustee") has been appointed as the Chapter 7 Trustee of the Debtor's estate; and

**WHEREAS**, the Debtor was in the business of wholesale distribution of bananas in the tri-state area. The Debtor is in bankruptcy operating under an Order entered June 23, 2014 authorizing interim debtor in possession financing agreement [dkt. no. 159] with All Island Bananas Corp. ("All Island"); and

**WHEREAS,** on April 15, 2014, the Landlord filed a Motion seeking, *inter alia,* the entry of an Order confirming that the Original Lease had been terminated and surrendered pre-petition due to numerous pre-petition defaults or in the alternative entry of an Order shortening the time for the Debtor to Assume of Reject the Original Lease (the "Termination Motion") [dkt no. 38], Opposition was filed by the Debtor [dkt. no 60] and the Landlord filed a Reply [dkt. no. 79]; and

**WHEREAS**, on or about April 20, 2014, the Debtor commenced an adversary proceeding against defendants John Balducci, Jr., James Balducci, and Christos Carambelas (the "Defendants") under Adversary Proceeding No. 14-08119-REG (the "Adversary Action"); and

**WHEREAS,** on July 3, 2014, the Debtor filed a Motion seeking the entry of an Order Extending the Time to Assume or Reject the Lease (the "Extension Motion") [dkt. no. 169], the

Landlord filed a Limited Objection [dkt. no. 213] and by Order entered July 31, 2014 [dkt. no. 220], the Debtor's time to assume or reject the Original Lease was extended through and including October 30, 2014; and

**WHEREAS**, on July 2, 2014, the Defendants filed a Motion for Partial Summary Judgment as to second, fourth and sixth claims for relief in the Adversary Action (the "Summary Judgment Motion") [dkt. no. 25 in Adv. Pro. 14-8119-REG]; and

**WHEREAS**, the Court directed that an evidentiary hearing on the narrow issue of whether the Debtor surrendered its Original Lease with the Landlord pre-petition would be heard before the Court (the "Narrow Issue"); and

**WHEREAS**, the Court heard evidence on the Narrow Issue related to the Original Lease on July 24, 2014 and September 11, 2014; and

**WHEREAS**, at an adjourned hearing before the Court held on September 11, 2014, the transcript of which is incorporated herein by reference, the Court was advised that the Debtor and the Landlord (collectively, the "Parties") had actively negotiated and engaged in good faith settlement negotiations to resolve the issues surrounding the Original Lease, the Termination Motion and the Adversary Action; and

**WHEREAS**, this Amendment of the Original Lease is made in accordance with the settlement of claims placed on the record at the hearing in In re Long Island Banana, Case No. 14-71443-REG, United States Bankruptcy Court, Eastern District of New York (the "Court"), dated September 11, 2014, as further amended on the record at the hearing held on December 3, 2014. This Amendment shall commence and be effective as of September 11, 2014 and continue for a period of three (3) years and three (3) months, and have three consecutive five (5) year options; and

**WHEREAS,** subject to the terms of this Amendment, Landlord and Tenant have agreed to amend the Original Lease in the manner described below and to resolve all claims among them including the Adversary Action.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed by and between the parties hereto as follows:

### AGREEMENTS:

1.    <u>Incorporation of Recitals.</u>    The facts and statements set forth in the foregoing "Whereas" clauses are incorporated by reference and agreed to by the parties hereto as if fully set forth herein.

2.    <u>Defined Terms</u>.  Capitalized terms used herein and not otherwise defined herein shall have the meanings given to such terms in the Lease.

3.      Conflict.  In the event there is a conflict between the terms and provisions of this Amendment and the Original Lease, the terms and provisions of this Amendment shall control.

4.      Lease Extension.  The term of the Lease is hereby renewed and shall continue for a period of three (3) years and three (3) months (the "Lease Term"), unless earlier terminated in accordance with the provisions of the Lease, and may be extended for a period of three consecutive five (5) year options (each a "Renewal Term") after the Lease Term in accordance with the terms of the Lease.  Except as modified by this Amendment, all of the terms, covenants and conditions of the Original Lease shall continue in full force and effect during all applicable Renewal Terms.  A copy of the Original Lease is annexed hereto as **Exhibit "A"**.

5.      Paragraph 4 of the Original Lease is hereby deleted in its entirety and replaced with the following:

New Paragraph 4.      The Tenant shall not sub-let the demised premises nor any portion thereof without the prior written consent of the Landlord.  The Tenant may assign this Lease, provided, that such assignee has demonstrated, prior to any such assignment and to Landlord's reasonable satisfaction, that (a) such assignee has the same or better financial wherewithal as that of the current Tenant; and (b) such assignee has provided Landlord with adequate assurances of future performance of the Lease by the assignee for the remainder of the Lease term of a kind that would be necessary to satisfy 11 U.S.C. §365(b)(1)(C). Notwithstanding the foregoing, the Tenant cannot assign the Lease to any member of the Hoey family or relative thereof, or to any corporation, partnership, limited liability company or trust that any Hoey family member may have an interest in, directly or indirectly, without Landlord's prior written consent.

6.      Paragraph 29 of the Rider to Lease is hereby deleted in its entirety and replaced with the following:

New Paragraph 29.    This Amendment shall modify the lease and rider effective as of January 1, 2003 between the Landlord and Tenant (as amended by this Amendment, the "Lease").  The parties hereby ratify all prior agreements and payments made under the Lease, including all of Tenant's obligation to pay utilities, oil, water, sewer, garbage removal, real estate taxes, and all other obligations for the Demised Premises.

This Amendment is made in accordance with the settlement of claims placed on the record at the hearing in In re Long Island Banana, Case No. 14-71443-REG, United States Bankruptcy Court, Eastern District of New York, dated September 11, 2014.  This Amendment shall commence and be effective as of September 11, 2014 (the "Commencement Date") and continue for a period of three (3) years and three (3) months, and have three consecutive five (5) year options.

(a)      For the period 10/1/14 – 12/31/14:  The rent for this period shall be equal monthly installments of $17,000.00, inclusive of real estate taxes.  For the avoidance of doubt, the monthly installments of rent for this period includes any real estate taxes owed for the year 2014, with Tenant having no other liability for real estate taxes accruing during such period.

(b)    For years 2015 through 2017, the annual rental payments, inclusive of real estate taxes, payable in equal monthly installments, shall be as follows:

|  |  |
|---|---|
| 2015: | $216,000.00 to be paid in equal monthly installments of $18,000.00 per month.  The rent includes any real estate taxes owed for the year 2015. |
| 2016: | $228,000.00 to be paid in equal monthly installments of $19,000.00 per month.  The rent includes any real estate taxes owed for the year 2016. |
| 2017: | $228,000.00 to be paid in equal monthly installments of $19,000.00 per month.  The rent includes any real estate taxes owed for the year 2017. |

(c)    Commencing in 2018 through the remaining term of the Lease, including any Renewal Terms, in addition to having to pay the annual rent payments in monthly installments, Tenant shall be solely responsible for the payment of any and all real estate taxes assessed, levied or owed during any such periods, as follows:

|  |  |
|---|---|
| Option Year One: (2018) | $138,000.00 to be paid in equal monthly installments of $11,500.00 per month, plus the payment of any and all real estate taxes assessed, levied or owed during such period. |
| Option Year Two: (2019) | $138,000.00 to be paid in equal monthly installments of $11,500.00 per month, plus the payment of any and all real estate taxes assessed, levied or owed during such period. |
| Option Year Three: (2020) | $150,000.00 to be paid in equal monthly installments of $12,500.00 per month, plus the payment of any and all real estate taxes assessed, levied or owed during such period. |
| Option Year Four: (2021) | $150,000.00 to be paid in equal monthly installments of $12,500.00 per month, plus the payment of any and all real estate taxes assessed, levied or owed during such period. |

| Option Year Five: (2022) | $162,000.00 to be paid in equal monthly installments of $13,500.00 per month, <u>plus</u> the payment of any and all real estate taxes assessed, levied or owed during such period. |
|---|---|
| Second Option Year One (2023) | $162,000.00 to be paid in equal monthly installments of $13,500.00 per month, <u>plus</u> the payment of any and all real estate taxes assessed, levied or owed during such period. |
| Second Option Year Two (2024) | $174,000.00 to be paid in equal installments of $14,500.00 per month, <u>plus</u> the payment of any and all real estate taxes assessed, levied or owed during such period. |
| Second Option Year Three (2025) | $174,000.00 to be paid in equal installments of $14,500.00 per month, <u>plus</u> the payment of any and all real estate taxes assessed, levied or owed during such period. |
| Second Option Year Four (2026) | $186,000.00 to be paid in equal installments of $15,500.00 per month, <u>plus</u> the payment of any and all real estate taxes assessed, levied or owed during such period. |
| Second Option Year Five (2027) | $186,000.00 to be paid in equal installments of $15,500.00 per month, <u>plus</u> the payment of any and all real estate taxes assessed, levied or owed during such period. |
| Third Option Year One (2028) | $198,000.00 to be paid in equal monthly installments of $16,500.00 per month, plus the payment of any and all real estate taxes assessed, levied or owed during such period. |
| Third Option Year Two (2029) | $210,000.00 to be paid in equal installments of $17,500.00 per month, plus the payment of any and all real estate taxes assessed, levied or owed during such period. |
| Third Option Year Three (2030) | $222,000.00 to be paid in equal installments of $18,500.00 per month, plus the payment of any and all real estate taxes assessed, levied or owed during such period. |

| Third Option Year Four (2031) | $234,000.00 to be paid in equal installments of $19,500.00 per month, plus the payment of any and all real estate taxes assessed, levied or owed during such period. |
| Third Option Year Five (2032) | $246,000.00 to be paid in equal installments of $20,500.00 per month, plus the payment of any and all real estate taxes assessed, levied or owed during such period. |

7.     <u>Utilities</u>.  Paragraph 32 of the Rider to Lease is hereby deleted in its entirety and replaced with the following:

<u>New Paragraph 32</u>.    **Utilities.**  Tenant shall maintain in its own name and pay when due all charges for water or any other utilities used by Tenant, which are, or may be, assessed or imposed upon the Demised Premises.  These charges shall include, but not be limited to, any water and sprinkler standby charges, sewer charges or sewer tax if based on use or consumption of water, gas, electricity, fuel and like utilities used or consumed in or upon the Demised Premises, including the operation of the heating, electricity, air-conditioning and sprinkler systems for the Demised Premises.  Plumbing and electrical wiring and fixtures installed on the Demised Premises by Tenant shall become the property of Landlord at the expiration of the term herein provided.  All utilities shall be placed in the name of Tenant.  Notwithstanding the foregoing, to the extent any utilities are required by the utility providers to be maintained in the name of the Landlord, Tenant agrees to promptly pay, or reimburse Landlord if paid by Landlord, all amounts due and owing to such utility upon Notice to Tenant of such outstanding amounts, which amounts shall constitute "Additional Rent" as such term is defined in the Lease.  Tenant shall be responsible for retaining the services of a sanitation removal company at Tenant's sole cost and expense and safely dispense and absorb the cost of said disposal.

8.     <u>Real Estate Taxes</u>.  Paragraph 33 of the Rider to Lease is hereby deleted in its entirety and replaced with the following:

<u>New Paragraph 33</u>.    **Real Estate Taxes.**  During the years 2014 through 2017, the Landlord shall be responsible for and pay any and all real estate taxes (including, but not limited to School, Village and Town Taxes) assessed and levied against the Demised Premises.  For the years 2018 through the balance of the term of the Lease, including during any Renewal Terms, Tenant shall be fully responsible for, liable and shall pay any and all real estate taxes, including any and all increases (including, but not limited to School, Village and Town Taxes) assessed and levied against the Demised Premises for such years.  During the year 2018 through the balance of the term of the Lease, including any Renewal Terms, Tenant shall pay any and all real estate taxes to the Landlord, on a monthly basis, and the Landlord shall be responsible for remitting such tax payments to the appropriate taxing authority.  All real estate taxes and increases thereon required to be paid by Tenant hereunder shall be paid to the Landlord as Additional Rent.  The Landlord shall promptly provide Tenant with copies of all notices, statements, assessments or levies provided to the Landlord by any and all relevant taxing authorities with respect to the foregoing taxes.  Nothing contained herein shall be deemed or construed in any manner to waive, rescind, limit or modify the liability and responsibility of

Tenant to pay the real estate taxes and any increases during the years 2018 to the end of the term of the Lease, including any Renewal Terms, in accordance with the terms hereof.

9.      Notices.  Paragraph 40 of the Rider to Lease is hereby deleted in its entirety and replaced with the following:

New Paragraph 40.  **Notices**.  Any notice, report, demand or other instrument authorized or required to be given or furnished ("Notices") shall be in writing and shall be given as follows: (a) by hand delivery, (b) by deposit in United States mail as first class certified mail, return receipt requested, postage paid; or (c) by overnight nationwide courier service, in each case, addressed to the party intended to receive the same at the following address(es):

|  |  |
|---|---|
| Landlord: | 28 William St. Corp. |
| | c/o John Balducci |
| | 15 Percy Williams Drive |
| | East Islip, New York 11730 |
| | |
| with a copy to: | LaMonica Herbst & Maniscalco, LLP |
| | 3305 Jerusalem Avenue |
| | Wantagh, New York 11793 |
| | Attn:  Joseph S. Maniscalco, Esq. |
| | |
| Tenant: | R. Kenneth Barnard, Esq., as Trustee |
| | of the estate of Long Island Banana Corp. |
| | 3305 Jerusalem Avenue, Suite 215 |
| | Wantagh, New York 11793 |
| | |
| with a copy to: | Thomas A. Draghi, Esq. |
| | Westerman Ball Ederer Miller Zucker & Sharfstein, LLP |
| | 1201 RXR Plaza |
| | Uniondale, New York 11556 |

Any party may change the address to which such Notice is to be delivered, by furnishing ten (10) days written notice of such change to the other parties in accordance with the provisions of this Section.  Notices shall be deemed to have been given on the date they are actually received or, in the case of notice given by certified mail, on the date that is three (3) business days after being deposited in the United States mail; provided, that the inability to deliver any Notice because of a changed address of which no Notice was given, or rejection or refusal to accept any Notice offered for delivery shall be deemed to be receipt of the Notice as of the date of such inability to deliver or rejection or refusal to accept delivery.

10.     Paragraph 62 of the Rider to Lease is hereby deleted in its entirety and replaced with the following:

New Paragraph 62. **Real Estate Tax Challenge**.  (a) Tenant may not obtain all or any portion of the benefits which may accrue to the Landlord from any reduction in the assessed valuation below the "Tax Base Year" and/or any reduction in Real Estate Tax rates as imposed

by the Town of Hempstead and/or any local governmental authority having taxing jurisdiction, the County of Nassau, and/or the State of New York for any period prior to 2018. Only the Landlord shall be eligible to institute tax reduction or other proceedings and obtain a rebate for periods during which Tenant paid its share of real estate taxes or increases for any period prior to 2018.

(b) From and after 2018 through the remaining term of the Lease, including any Renewal Terms, however, Tenant shall have the exclusive right, at its own expense, to contest and dispute any such taxes. Tenant's right to contest shall be subject to (i) Tenant not being in default, past applicable notice and cure periods, under the Lease, (ii) no contest proceedings initiated by Tenant shall be conducted in such a manner as to cause the loss of the Demised Premises through sale or forfeiture, (iii) if any such contest proceedings could reasonably result in such loss, then, as a condition to such contest, Tenant shall post security (either in the form of cash, a bond or a letter of credit, as Tenant may elect or as may be required by applicable law) in the full amount of the lien or claim being contested (or such higher amount as may be required by applicable law), (iv) the Landlord shall assist Tenant with respect to any action taken by Tenant pursuant to this Section, so long as Tenant promptly reimburses the Landlord for all reasonable, out of pocket costs actually incurred by the Landlord as a direct result thereof, and (v) no contest may be conducted if same would subject to the Landlord to any civil or criminal liability, or result in a default under any fee mortgage encumbering the Demised Premises to which the Landlord is a party. Tenant shall be entitled to any refund awarded as a result of such tax contest as described in this paragraph 62(b) that is a refund attributable to any taxes paid by Tenant for the period from and after January 1, 2018 through the remaining term of the Lease, including any Renewal Terms.

11.    <u>Assignment and Assumption</u>.  Paragraph 71 of the Rider to Lease titled "Good Guy" clause is hereby deleted in its entirety and replaced with the following:

<u>New Paragraph 71(2)</u>[1] **Security Deposit**.  (a)  On or before December 31, 2014, Tenant shall deposit with Landlord the sum of $75,000.00 as a security deposit for the faithful performance of the terms and conditions of the Lease (the "Security Deposit"). On October 1, 2015, so long as the Tenant has not been in default of any of the terms of the Lease occurring on or after December 31, 2014, that are not timely cured within in any applicable notice and cure periods, the Landlord will return $25,000.00 of the security deposit to Tenant.  On January 1, 2018, so long as Tenant has not been in default of any of the terms of the Lease occurring on or after December 31, 2014, that are not timely cured within in any applicable notice and cure periods, and Tenant properly exercises its right to extend the terms of the Lease through the first option period, the Landlord will return $15,500.00 to Tenant. In no event shall the security deposit ever be less than $34,500.00 during the term of the Lease, including any Renewal Terms.

(1)    Except as required by law, the Landlord shall not be required to place the Security Deposit in an interest bearing account and may co-mingle the Security Deposit with its other funds.  If Tenant defaults beyond the expiration of any applicable notice or cure period in respect of any of the terms, provisions, covenants or conditions of the Lease, including, but not limited to, the payment of Base Rent or any item of Additional Rent, the Landlord shall have the right to

---

[1]    There are two paragraphs numbered 71 in the Rider to Lease.  This covers the second paragraph numbered 71 on page 19.

apply the Security Deposit to the extent required for the payment of Base Rent or any item of Additional Rent or any other sum as to which Tenant is in default or for any other sum which Landlord may expend or may be required to expend by reason of Tenant's default beyond the expiration of any applicable notice or cure period in respect of any of the terms, provisions, covenants or conditions of the Lease, including but not limited to, any damages or deficiency accrued before or after summary proceedings or other re-entry by the Landlord.  Tenant shall have no right to object to such application of the Security Deposit or any part thereof.  In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, the Security Deposit shall be refunded to Tenant by the Landlord after the date fixed as the end of the term of the Lease and after delivery of the entire possession of the Demised Premises to the Landlord as provided hereunder.  Tenant further covenants that it will not assign or encumber or attempt to assign or encumber the monies deposited herein as security and that the Landlord and its successors or assigns shall not be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.  In the event the Landlord applies any portion or all of the Security Deposit, Tenant shall forthwith restore with the Landlord the amount so applied or retained by the Landlord so that at all times during the Term of this Lease, the amount deposited with the Landlord shall be equal to the amount specified above in this Section.

(2)     In the event of a sale of the Demised Premises, or an assignment by the Landlord of its interest under this Lease, Landlord shall transfer the Security Deposit to the transferee and upon such transfer the Landlord shall thereupon be released by Tenant from all liability for the return of such Security Deposit, and Tenant shall look solely to the new landlord for the return of said Security Deposit.  The provisions of this Section shall apply to every transfer or assignment made of the security to a new landlord.

(3)     In no event shall the Landlord be obligated to apply the Security Deposit, and the Landlord's right to bring an action or special proceeding to recover damages or otherwise to obtain possession of the Demised Premises before or after the Landlord's declaration of the termination of the Lease for non-payment of rent or for any other reason shall not be affected by reason of the fact that the Landlord holds the Security Deposit.

(4).     The Security Deposit will not be a limitation on the Landlord's damages or other rights and remedies available under the Lease, or at law or equity, nor shall the Security Deposit be a payment of liquidated damages.

(5).     The Security Deposit will not be an advance payment of the Base Rent or Additional Rent.

**(b)     Assignment and Assumption**.  As of September 11, 2014, as set forth on the record at the Settlement Hearing and incorporated herein, so long as the Debtor does not default under the terms of the Lease, the Landlord has agreed to extend the Debtor's time to assume or reject the Lease (as amended herein) until December 31, 2014 in consideration of, among other things, the immediate dismissal of the litigation titled Long Island Banana Corp. vs. 28 William St. Corp, *et al.*, Adv. Pro. No.14-08119-REG (the "Adversary Action") with prejudice.  Upon dismissal of the Adversary Action, the Landlord agrees that the Debtor's Lease is assumable, withdraws its assertion that the Lease has been surrendered or terminated pre-

petition.  Upon dismissal of the Adversary Action, the Landlord shall file a letter with the Court withdrawing its motion for partial summary judgment [dkt. nos. 25, 26, 27].

(1)     Upon the Debtor or the Trustee on behalf of the Debtor's bankruptcy estate assuming and/or assigning the Lease to All Island, which shall occur no later than December 31, 2014, as a condition thereof, the Landlord shall be paid the sum of $117,000.00 as a cure payment under Section 365 of the Bankruptcy Code (the "Modified All Island Cure Payment") which amount includes December rent in the amount of $17,000.00.  Subject to the Modified All Island Cure Payment being timely paid to the Landlord, the Landlord hereby acknowledges, consents and agrees that All Island is an acceptable assignee and that all of the requirements under the Bankruptcy Code, including under Section 365(b), including the requirement for adequate assurance of future performance under Section 365(b)(2)(C), for the assumption and assignment to All Island, are otherwise satisfied.

(2)     In the event the Debtor or the Trustee on behalf of the Debtor's bankruptcy estate assumes the Lease, but does not seek an assignment to All Island but rather to a third party, which shall occur no later than December 31, 2014, as a condition thereof, (i) the Landlord shall be paid the sum of $217,000.00 as a cure payment under Section 365 of the Bankruptcy Code (the "Modified Third Party Cure Payment"), which amount includes December rent in the amount of $17,000.00; and (ii) any such proposed third party assignee shall be required to provide adequate assurance of future performance as required by Section 365(b)(2)(C) of the Bankruptcy Code.  For the avoidance of doubt, the Landlord specifically reserves all protections afforded under Section 365 the Bankruptcy Code as it concerns Landlord's right to receive adequate assurance of future performance from any such third party assignee.  Subject to the provisions of (i) and (ii) of this paragraph being satisfied, the Landlord acknowledges, consents and agrees to the assumption and assignment of the Lease being assumed and assigned to any such third party assignee.

(3)     In the event (i) the Modified All Island Cure Payment is not timely made and the Debtor or the Trustee on behalf of the Debtor's bankruptcy estate does not assume the Lease and/or assign it to All Island, or (ii) the Modified Third Party Cure Payment is not timely made and the Debtor or the Trustee on behalf of the Debtor's bankruptcy estate does not assume the Lease and/or assign it to a third party assignee who satisfies the requirement of providing adequate assurance of future performance under Section 365(b)(2)(C) of the Bankruptcy Code, the Lease shall be deemed rejected and the Debtor or the Trustee shall thereafter immediately surrender possession of the Demised Premises to the Landlord.

(4)     No later than November 14, 2014, Landlord shall be paid the balance of PSEG LI charges in the amount of $6,096.38.

12.     Option Period One.  Paragraph 72 of the Rider to Lease is hereby deleted in its entirety and replaced with the following:

New Paragraph 72.     **Option Period One**.  (a) Provided that Tenant is not in default of any of the provisions of this Lease, beyond all applicable grace and cure periods, Tenant shall have an option to renew the Lease for an additional period of five (5) years provided, however, that the option right shall only be deemed to exist and be effective if Tenant gives the Landlord

notice of its election to exercise this right by written instrument, sent by (i) hand delivery, (ii) certified mail, return receipt requested, or (iii) by overnight nationwide courier service in accordance with the notice provisions of this Amendment, so as to be actually received by the Landlord no later than six (6) months prior to the expiration of the original Lease Term.

Should Tenant fail to exercise its option within the prescribed time in this paragraph, then Tenant shall be deemed to have waived said option right and same shall be deemed null and void.

**Option Period Two**.  (b) Provided that Tenant is not in default of any of the provisions of the Lease, beyond all applicable grace and cure periods, Tenant shall have an option to renew the Lease for an additional period of five (5) years beyond Option Period One described above provided, however, that the option right shall only be deemed to exist and be effective if Tenant gives Landlord notice of its election to exercise this right by written instrument to such effect, sent by (i) hand delivery, (ii) certified mail, return receipt requested, or (iii) by overnight nationwide courier service in accordance with the notice provisions of this Amendment, so as to be actually received by the Landlord no later than six (6) months prior to the expiration of the Renewal Term of the Lease resulting from Tenant's prior exercise of Option Period One.

Should Tenant fail to exercise its option within the prescribed time in this paragraph, then Tenant shall be deemed to have waived said option right and same shall be deemed null and void.

**Option Period Three**.  (c) Provided that Tenant is not in default of any of the provisions of the Lease, beyond all applicable grace and cure periods, Tenant shall have an option to renew the Lease for an additional period of five (5) years beyond Option Period One and Option Period Two described above provided, however, that the option right shall only be deemed to exist and be effective if Tenant gives the Landlord notice of its election to exercise this right by written instrument, sent by (i) hand delivery, (ii) certified mail, return receipt requested, or (iii) by overnight nationwide courier service in accordance with the notice provisions of this Amendment, so as to be actually received by the Landlord no later than six (6) months prior to the expiration of the Renewal Term of the Lease resulting from Tenant's prior exercise of Option Period Two.

Should Tenant fail to exercise its option within the prescribed time in this paragraph, then Tenant shall be deemed to have waived said option right and same shall be deemed null and void.

13.     The following shall be added as New Paragraph 74 of the Rider to Lease:

New Paragraph 74.    **Full Force and Effect**.   All other terms and conditions of the Original Lease not specifically amended or modified by this Amendment shall remain in full force and effect.  The Landlord and Tenant do hereby ratify and affirm the said terms and covenants of the Original Lease, save as amended or modified herein.

14.     The following shall be added as New Paragraph 75 of the Rider to Lease:

New Paragraph 75.    **Representations**.  The Landlord and Tenant herby represent that each party has the full power and authority to execute this Amendment and be bound by the terms hereof without consent from any entity or person.  This Amendment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, successors and assigns.

15.    The following shall be added as New Paragraph 76 of the Rider to Lease:

New Paragraph 76.    **Authority**.  The terms and conditions of this Amendment shall be binding upon, and inure to the benefit of the Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns.  Except as specifically amended hereby, the Original Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect.  In the event of any conflict or inconsistency between the terms and provisions of the Original Lease and this Amendment, the terms and provisions of this Amendment shall govern and control.

16.    The following shall be added as New Paragraph 77 of the Rider to Lease:

New Paragraph 77.    **Counterparts**.  This Amendment may be executed in multiple counterparts each of which when taken together shall constitute a binding agreement.

[SIGNATURES ON FOLLOWING PAGE]

**IN WITNESS WHEREOF,** the parties hereto have affixed or caused to be affixed their respective signatures as of the date set forth above.

**LANDLORD, 28 WILLIAM ST. CORP.:**


By: _____
    Name:  John Balducci
    Title:   President


**TENANT, R. KENNETH BARNARD, ESQ., AS CHAPTER 7 TRUSTEE OF THE ESTATE OF LONG ISLAND BANANA CORP.:**


By: _____
    Name:  R. Kenneth Barnard, Esq.
    Title:   Chapter 7 Trustee

*1089173*