WESTERMAN BALL EDERER                      Hearing Date:  May 13, 2015
MILLER ZUCKER & SHARFSTEIN, LLP            Time:
1201 RXR Plaza
Uniondale, New York 11556
(516) 622-9200
Thomas A. Draghi, Esq.
Mickee M. Hennessy, Esq.

*Counsel for R. Kenneth Barnard, Esq.*
*Chapter 7 Trustee*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:                                     Chapter 7 (Converted) (LEAD)
                                           Case No: 14-71443-REG
LONG ISLAND BANANA CORP.,

                          Debtor.
----------------------------------------------------------------x
In re:                                     Chapter 7 (Converted)
                                           Case No: 14-71444-REG
SUFFOLK BANANA CO., INC.,

                          Debtor.
----------------------------------------------------------------x
In re:                                     Chapter 7 (Converted)
                                           Case No: 14-71453-REG
P.F. TRANSPORT, INC.,
                                           (Jointly Administered)
                          Debtor.
----------------------------------------------------------------x


**MOTION FOR (I) ENTRY OF AN ORDER PURSUANT TO FRBP 9019 APPROVING
THE STIPULATION AND ORDER (A) RESOLVING PRIORITY CLAIMS, SECURED
CLAIMS, AND INTERESTS AGAINST THE CHAPTER 7 BANKRUPTCY ESTATES
AND (B) SETTING DISTRIBUTIONS FROM DEBTORS' ESTATES AND
LIQUIDATION PROCEEDS; (II)  GRANTING A HEARING
ON SHORTENED NOTICE; AND (III) GRANTING RELATED RELIEF**


**TO:    THE HONORABLE ROBERT E. GROSSMAN,
        UNITED STATES BANKRUPTCY JUDGE:**


        R. Kenneth Barnard, Esq., as Chapter 7 Trustee (the "Trustee") of the estates of Long Island

Banana Corp. ("LIB"), Suffolk Banana Co., Inc. ("SBC") and P.F. Transport Inc. ("PFT," and

together with LIB and SBC, the "<u>Debtors</u>"), by his attorneys Westerman Ball Ederer Miller Zucker & Sharfstein, LLP, hereby moves (the "<u>Motion</u>") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure ("<u>FRBP</u>") for entry of the Stipulation and Order attached hereto as "<u>Exhibit A</u>" (the "<u>Stipulation and Order</u>")[1] by and among the Trustee; Citibank, N.A. ("<u>Citibank</u>"); All Island Banana Corp. ("<u>All Island</u>"); Morris Okun, Inc.; Fierman Produce Exchange Inc.; Katzman Berry Corp.; S. Katzman Produce, Inc.; Dole Fresh Fruit Company; Chiquita Fresh North America, LLC; Montalbano Properties, Inc. d/b/a/ Peter's Fruit Co.; Rubin Bros. Produce Corp.; Luna Fresh Greenhouse Corp. d/b/a Luna Fresh Produce; Coosmans New York, Inc.; Robert T. Cochran & Co.; Best Tropical Island, Inc.; D'Arrigo Bros. Co. of New York, Inc.; Banacol Marketing Corp. and Del Monte Fresh Produce N.A., Inc.; and Truisfruit S.A.; and certain creditors who are suppliers or sellers of agricultural products and have timely filed claims against any of the Debtors based on certain statutory rights under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a et seq. ("<u>PACA</u>"), and whose claims are not objected to or disallowed (collectively, the "<u>PACA Creditors</u>").  In support of this Motion, the Trustee respectfully states as follows:

<b><u>PRELIMINARY STATEMENT</u></b>

1.      As set forth more fully below, the Trustee has undertaken diligent efforts in accordance with his statutory mandate and the reasonable exercise of his business judgment to liquidate substantially all of the assets of the Debtors in a manner that has maximized their value for the benefit of the Debtors' estates and their creditors.  There are, however, several competing and disputed claims and assertions as to the amount and priority to be accorded to claimants as against the liquidation proceeds of such assets.  The Debtor's Chapter 7 estates are, in all events,

---

[1]      Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Stipulation and Order.

administratively insolvent.  After extensive, good faith, arm's length negotiations, and subject to Bankruptcy Court approval, the Trustee and his professionals, together with parties asserting competing trust fund, secured, administrative priority and other claims (including, without limitation, PACA Creditors, Citibank and All Island), have come to an agreement that will resolve all of the pending disputes among the settling parties as it concerns distribution of the proceeds from liquidation of the Debtors' assets, facilitate an orderly distribution of the proceeds of the Debtors' assets and result in an efficient and orderly disposition of these cases.

2.      As a result of the above-described settlement efforts and negotiations, each of the settling constituencies asserting trust fund, secured, administrative priority and other claims has agreed to accept *significantly reduced amounts* from those otherwise asserted as due and payable, such that the Trustee can ensure that there is a benefit realized for the Debtors' estates from the proceeds of the liquidation efforts that otherwise would not exist.  Accordingly, the Trustee respectfully requests that this Court approve the proposed Stipulation and Order attached hereto and grant such other and further relief as this Court deems necessary and proper.

3.      The proposed settlement embodied in the Stipulation and Order is necessarily dependent on the approval, confirmation and closing on the auction sale of P.F. Transport Inc.'s nonresidential real property located at 19 Old Dock Road, Yaphank, New York (the "Yaphank Property") which was conducted on March 26, 2015.  Accordingly, the Trustee requests that a hearing on this Motion be held on shortened notice, at the same time as the hearing on confirmation of the sale of the Yaphank Property which is presently scheduled for May 13, 2015. As noted above and discussed herein, confirmation and closing on the Yaphank Property is integral to the proposed Stipulation and Order, as the latter constitutes the parties' agreement concerning the distribution of the proceeds of that sale along with other liquidation proceeds. The Trustee respectfully requests that a hearing on approval of the proposed Stipulation and

3

Order be held on shortened notice to the extent necessary for the Court to consider confirmation of the sale of the Yaphank Property and approval of this Stipulation and Order at one hearing on May 13, 2015.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (O).

5.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory bases for the relief requested herein are §§ 102(1), 105(a) and 363 of Title 11 of the United States Code, 11 U.S.C. §§101, et seq. (the "Bankruptcy Code") and FRBP Rules 9006(c)(1), 9013 and 9019.

## BACKGROUND

7.      On April 3, 2014 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On information and belief, the Debtors' bankruptcy filings were precipitated by, among other things, a dispute between LIB and its landlord 28 William Street Corp. ("Landlord") with respect to a certain lease (the "Lease") of non-residential real property located at 28 Williams Street, Lynbrook, New York (the "Leased Premises").

8.      By Order entered on October 16, 2014, the Debtors' cases were converted to cases under Chapter 7 of the Bankruptcy Code (the "Conversion Order") (See Conversion Order, LIB Docket No. 254, SBC Docket No. 75, PFT Docket No. 61).

9.      R. Kenneth Barnard, Esq. was appointed the Chapter 7 Trustee for each of the Debtors' estates.  In furtherance of the Conversion Order, the Trustee took immediate steps to communicate with the Debtors' principals, professionals, other creditors and their respective

4

counsel, to assess the current state of affairs and ensure the timely sale of this Debtors' perishable goods, secure the Debtors' properties, and maximize the Debtors' estates.

**A.    Retention of David R. Maltz & Co., Inc.**

10.    On November 20, 2014, the Trustee filed an application in each of the LIB and SBC cases, seeking to employ David R. Maltz & Co., Inc. ("Maltz") as Auctioneer, to assist in the marketing and sale of the Lease and related assets of LIB, and to assist in securing, marketing and conducting an auction sale of vehicles and trucks owned by LIB and SBC. (LIB Docket. No. 285, SBC Docket No. 86).  On November 24, 2014, Orders granting the foregoing relief were entered in each of the LIB and SBC cases. (LIB Docket No. 286, SBC Docket No. 87).

**B.    Liquidation of the LIB Assets**

Auction Sale of the Lease and Ripening Rooms

11.    On November 26, 2014, the Trustee filed a motion for an Order (A) authorizing an auction process and approving bid procedures for (1) the disposition of the Debtor's interest in the Leased Premises; and (2) sale of the Debtor's refrigeration units (*i.e.,* the ripening rooms); (B) scheduling a hearing thereon on shortened notice; and (C) granting related relief (LIB Docket No. 287).  After a hearing , on December 5, 2014, the Court entered an Order Authorizing the Auction Process and Approving Bid Procedures and scheduling a hearing to seek approval of the results of the Auction and for related relief.  LIB Docket No. 306.

12.    On December 23, 2014, following an additional submission to the Court, after a hearing and due deliberation thereon, the Court entered an Order confirming the results of the Trustee's auction sale of LIB's interest in the Lease, the Ripening Rooms and certain additional assets (collectively, the "Lease Sale").  LIB Docket No. 320.

13.    The Trustee sold the LIB Debtor's interest in the Lease and additional assets for $577,000.00.  After payment of the cure amount due to Landlord of $217,000.00, the Trustee is

holding proceeds from the Lease Sale of $360,000.00.

### Auction Sale of LIB Vehicles

14.    On December 18, 2014, the Trustee filed a notice of the proposed auction sale of certain vehicles owned by LIB (*See*, LIB Docket No. 314, the "LIB Vehicle Sale).  No objections were filed the proposed auction sale.  On March 31, 2015, the Auctioneer's Report of the Result of the Auction Sale with respect to the LIB Vehicle Sale was filed in the LIB case (LIB Docket No. 349, 350).  The Trustee received proceeds from the LIB Vehicles Sale in the amount of $131,603.28.

### Liquidated LIB Accounts Receivable

15.    In addition to the foregoing, since the Petition Date, LIB receivables were collected in the amount of $45,278.

16.    Accordingly, the aggregate amount of monies realized from the above transactions resulted in total receipts by the Trustee of approximately $754,000 in the LIB case. From that sum, the Trustee paid out $217,000 for the Lease cure amount and an additional approximately $25,000 in accordance with prior orders of the Court in connection with the Trustee's post-conversion operation and administration of LIB, leaving a total of approximately $510,000 currently in the LIB Debtor's estate.

### C.    **Liquidation of the SBC Assets**

17.    On December 18, 2014, the Trustee filed a notice of the proposed auction sale of certain vehicles owned by SBC (*See,* SBC Docket No. 89, the "SBC Vehicle Sale").  No objections were filed to the proposed auction sale.  On March 31, 2015, the Auctioneer's Report of the Result of the Auction Sale with respect to the SBC Vehicle Sale was filed in the SBC case (SBC Docket No. 96).  The Trustee received proceeds from the SBC Vehicles Sale in the amount of $71,500 and is currently holding approximately $70,000 in his Trustee's account after payment

of certain incidental estate expenses.

### D.     Liquidation of the PFT Assets

Auction Sale of the Yaphank Property (the PFT Sale)

18.     Pursuant to the Motion filed on February 19, 2015 (PFT Docket No. 77), the Trustee, with the assistance of Maltz, conducted an auction sale of the Yaphank Property on March 26, 2015. The highest bid amount was $1.45 million, plus a buyer premium of 4% (*i.e.,* $58,000) for the broker's commission.  Real property taxes owed by the estate are approximately $20,000.00.  Accordingly, if the sale of the Yaphank Property is confirmed and consummated (the "PFT Sale"), the aggregate amount of monies realized such sale (after payment of real property taxes) should be approximately $1,430,000.00.

19.     In sum, as a result of liquidation of the LIB Assets, the SBC Assets and the PFT Assets (once the PFT Sale is closed), the Trustee should ultimately have in his possession for distribution total proceeds aggregating approximately $2,010,000 (the "Liquidation Proceeds").

### E.     Disputes Among Creditors As to Validity, Priority and Amounts of Claims

20.     During the course of the pending cases, various constituencies have asserted competing claims and priorities with respect to each of the Debtors' assets and the proceeds from the sale thereof.  The competing claims are summarized below;

### Citibank Claims

21.     Prior to the Petition Date, Citibank extended a secured line of credit to LIB in the amount of $1,250,000 ("Citibank Personalty Loan").  To secure the Citibank Personalty Loan, LIB granted Citibank a security interest in all of its personal property, including produce inventory and the accounts and proceeds of sale of inventory.  SBC, PFT, and the Debtors' principal, Thomas J. Hoey, Jr. ("Hoey"), each guaranteed payment of the Citibank Personalty Loan.

22.     Prior to the Petition Date, Citibank made a $750,000 mortgage loan to PFT ("Citibank Mortgage Loan"), secured by a mortgage on the Yaphank Property and each of LIB, SBC, and Hoey guaranteed payment of the Citibank Mortgage Loan.  In addition, each of the Debtors granted Citibank a security interest in all of its personal property to secure the obligations owed to Citibank.

23.     Citibank asserts that the outstanding amount currently owed by LIB under the Citibank Personalty Loan is approximately $1.28 million, with interest, fees and costs continuing to accrue.  Citibank asserts that the unpaid amount under the Citibank Mortgage Loan is not less than $858,000, with interest, fees and costs continuing to accrue.

24.     Citibank has asserted or reserved its rights against, among other things, produce inventory and proceeds and accounts.

**PACA Creditors' Claims**

25.     As defined more specifically in the attached Stipulation and Order, the PACA Creditors were suppliers of wholesale quantities of produce to LIB and SBC.  The PACA Creditors assert that, prior to the Petition Date, they sold and delivered produce to the Debtors worth approximately $1.87 million for which neither LIB nor SBC made payment when due.  The PACA Creditors assert certain statutory rights as against LIB, SBC, PFT and Hoey to enforce the trust provisions of Section 5(c) of the Perishable Agricultural Commodities Act, 7 U.S.C. §499e(c) ("PACA") as against any and all receivables or proceeds for the sale of the commodities in trust for the benefit of all unpaid suppliers or sellers of the commodities until paid in full. Officers of purchasers may be liable to trust beneficiaries for nonpayment based on a breach of the trust or dissipation of trust assets.

26.     Prior to the Petition Date, certain of the PACA Creditors commenced an action in the United States District Court for the Eastern District of New York, Case No. 14-cv-00982

("District Court Action") against, among others, LIB, SBC, Hoey, and Brook Enterprises Ltd., an entity that is owned by Hoey ("Brook"), alleging, among other things, certain real property owned by Brook is part of the PACA trust.

27.    Pursuant to a March 8, 2014 Consent Injunction entered in the District Court Action, certain produce inventory and receivables were collected and liquidated by the parties and escrow accounts were established in which there are presently being held funds in the amount of no less than $476,033.97 ("Escrow Funds"), subject to further order of the District Court or the Bankruptcy Court.  By Order dated March 12, 2015, the Trustee abandoned any interest the Debtors' estates may have in the Escrow Funds.

28.    The PACA Creditors allege that PACA imposes a statutory trust on all produce-related assets, including receivables and proceeds from the sale of produce, and any other assets acquired by or maintained with PACA trust assets, including assets held by third parties.  The PACA Creditors assert that the trust is broad and exists for the benefit of all produce suppliers and must be recognized and maintained until all suppliers are paid in full.  The PACA Creditors also contend that their interests in trust assets are prior and senior to the claims of other creditors, including secured creditors.

29.    In the District Court Action, the plaintiff PACA Creditors assert first priority and senior rights in, among other things, the Escrow Funds and certain real estate and its sale proceeds.

30.    The District Court has described a PACA trust as one "made up of perishable agricultural commodities received in all transactions, all inventories of food . . . and all receivables of proceeds from the sale of such commodities . . . ."  *See* District Court Action, Decision and Order dated June 23, 2014 (Docket No. 116) (noting that a PACA trust arises when the first PACA debt is incurred and continues until sellers are paid in full), *quoting In re*

*Kornblum & Co., Inc.*, 81 F.3d 280, 286 (2d Cir. 1996).

31.     Further, the District Court stated that a PACA trust "is continuous and exists from the moment produce is received until all suppliers are paid in full." *Id., quoting Ger-Nis Int'l, LLC v. FJB, Inc.*, 07-cv-898 (CM), 2008 WL 2600074, at *4 (S.D.N.Y. June 25, 2008) and *citing J.A. Besteman Co. v. Carter's Inc.*, 439 F. Supp.2d 774, 778 (W.D. Mich. 2006).

32.     The District Court also recognized that third parties and transferees can be held liable for PACA debts in certain circumstances. *Id.,* at p. 7, *citing American Banana Co. v. Republic National Bank*, 362 F.3d 33, 41 (2d Cir. 2004) and *Eastern Potato Dealers, Inc. v. TNC Packing Corp.*, 08-cv-6280 (CJS), 2011 WL 2669632, at *12 (W.D.N.Y. 2011).

33.     Based on, among other things, the reasons asserted by the PACA plaintiffs in the District Court Action, certain of the PACA Creditors have asserted or reserved their alleged prior and senior PACA trust claims and rights against, among other things, all assets of each of the Debtors, including the Yaphank Property and its sale proceeds, and the real property owned by Brook located at 590 Merrick Road, Lynbrook, New York (the "590 Premises").   These contentions are disputed by, among others, the Trustee, Citibank and All Island.

**All Island's Claims**

34.     After commencing their Chapter 11 cases, the Debtors secured a debtor-in-possession loan ("DIP Loan") from All Island pursuant to an Interim Order filed on June 23, 2014 ("Interim Order").   The DIP Loan was authorized up to the amount of $1.725 million and All Island asserts that the outstanding amount owed and outstanding on the DIP Loan is at least $510,801.55.

35.     The DIP Loan is secured by all of the Debtors' real and personal assets, subject to prior valid, enforceable, and perfected liens and interests.   Hoey and certain entities owned by him, including Brook, guaranteed repayment of the DIP Loan.   Brook's guaranty was secured by

mortgages in the aggregate amount of $1 million on, among other real property, the 590 Premises owned by Brook.

36.     Pursuant to the Interim Order, the DIP Loan was accorded superpriority status under Bankruptcy Code section 364(c)(1), over all specified administrative expenses, including Chapter 11 and Chapter 7 administrative expenses.  Pursuant to the Interim Order, All Island agreed that the collateral securing the DIP Loan may be used to pay fees and expenses of professionals retained by the Debtors up to the aggregate amount of $75,000, plus United States Trustee statutory fees due pursuant to 28 U.S.C. §§ 1930(a)(6) ("U.S. Trustee Fees"), which total $8,450.55 in the collective Chapter 11 cases based on claims filed by the U.S. Trustee's office (together, the "Carve Out").

**Chapter 7 Administrative Claims**

37.     Subject to Bankruptcy Court approval, the Chapter 7 Trustee is entitled to commissions on his liquidation of the Debtors' assets in an amount aggregating $116,296.59, consisting of $40,981.59 from the receipts in LIB, $6,825 from the receipts in SBC and $68,490.00 from the receipts in PFT (assuming the PFT Sale is confirmed and closes).

38.     Although neither an Interim nor Final Fee Application has yet been filed by counsel for the Trustee, counsel for the Trustee has incurred fees and expenses from the Conversion Date through the date hereof aggregating approximately $380,000, and anticipates incurring approximately $20,000 through the remainder of the case, for a total of $400,000 for services rendered in the Debtors' cases.

39.     Maltz has asserted fees and expenses incurred in connection with its role as Auctioneer/Broker, as applicable, in the Debtors' cases in the aggregate amount of $154,515.12, consisting of $62,787.86 from the Lease Sale and the LIB Vehicles Sale (including $32,842.26 in expenses payable to Statewide Auction Inc., for towing and storage of the vehicles pending the

auction); fees and expenses incurred in connection with the SBC Vehicles Sale totaling $32,877.26 (including $22,765.00 in expenses payable to Statewide Auction Inc., for towing and storage of the vehicles pending the auction); and $850 for winterizing the Yaphank Property, plus a brokerage commission from the PFT Sale once approved and closed, in the amount of $58,000.00 (*i.e.,* the 4% buyer's premium called for in connection with the sale of the Yaphank Property).

40.    Although neither an Interim nor Final Fee Application has yet been filed by Thomas Wisnieski, CPA as accountants, for the Trustee, the Trustee anticipates that the accountant's fees and expenses presently aggregate approximately $10,000.00.

41.    All totaled, the Chapter 7 administrative expenses are expected to aggregate approximately $680,000.

## F.    The Debtors are Administratively Insolvent.

42.    Leaving aside positions as to priority, the aggregate amount of administrative, secured and priority claims asserted against the Debtors aggregate approximately $4,897,961.71, which is well in excess of the $2,010,000 in combined Liquidation Proceeds collected by the Trustee.  Taking the various assertions of amounts due as true, these cases are, for all intents and purposes, administratively insolvent.

43.    Indeed, even on a case-by-case basis, the amount of alleged trust fund, secured, priority and other claims exceed the proceeds held, or to be held, by the Trustee.  For example, leaving aside Chapter 7 administrative expenses, in the LIB case, the approximately $510,000 collected by the Trustee and remaining in that estate is subject to, among other claims, the competing $1.87 million PACA Claims; the $1.28 million Citibank Personalty Loan Claim; and the $510,000 DIP Loan Claim.  In the SBC case, the approximately $70,000 collected by the Trustee in that estate is subject to, among other claims, the $1.87 Million PACA Claims; the

$1.28 Million Citibank Personalty Loan Claim; and the $510,000 DIP Loan Claim.  In the PFT case, the $1,430,000 anticipated to be collected by the Trustee is subject to, among other claims, the $1.87 Million PACA Claims; the $858,000 Citibank Mortgage Loan Claim; and the $510,000 DIP Loan Claim.

44.     But for the efforts all of the foregoing creditor constituencies to compromise their respective claims – including the Chapter 7 Trustee and his professionals as discussed below -- there was and is a very real risk that there will be protracted litigation that will deplete or exhaust the receipts recovered by the Trustee, together with the risk of a loss of benefit to the Debtors' estates resulting from the efforts of the Trustee and his professionals to monetize and maximize the value of the estates through the above-described sales.

## THE STIPULATION AND ORDER

45.     In order to resolve all outstanding claims and litigation relating to the various claims and positions asserted by the varying constituencies, subject to approval by this Court (and assuming confirmation and closing of the sale of the Yaphank Property), the Trustee,  All Island, Citibank and the PACA Creditors (which hold substantially all of the PACA trust fund claims asserted against the Debtors) have successfully negotiated and entered into a proposed Stipulation and Order which resolves all of the pending disputes among the settling parties concerning priority of liens and interests, distribution of liquidation proceeds, funding of administrative expenses and the efficient and orderly disposition of these complex and highly contentious cases. A copy of the Stipulation and Order is attached hereto as "Exhibit A."

46.     The Stipulation and Order should be reviewed in its entirety for its complete terms. The salient provisions of the Stipulation and Order are as follows:[2]

---

[2] The salient provisions are provided for reference.  If there is any discrepancy between the descriptions in this Motion and the terms of the Stipulation and Order, the terms of the Stipulation and Order shall govern.

a.    **Citibank**.  On account of the Citibank Mortgage Loan claim, Citibank shall (i) be paid $750,000, as soon as practicable after the closing of the sale of the Yaphank Property; and (ii) retain approximately $7,000 currently on deposit at Citibank.

b.    **PACA Creditors**.  On account of their PACA-related claims, the PACA Creditors shall be paid the aggregate amount of $678,500, as soon as practicable after the closing of the sale of the Yaphank Property, to be further distributed ratably among all PACA Creditors pursuant to a separate order or agreement between and among the PACA Creditors to be entered in the District Court Action.  In addition, the Settling Parties[3] have agreed that the PACA Creditors shall have the exclusive right to seek and enforce its rights to obtain recovery on account of their remaining claims from the Escrow Funds (which funds were abandoned by the Trustee and are not property of the Debtors' estates).

c.    **All Island**.  On account of its DIP Loan claim, All Island shall be allocated $102,500 (the "All Island Liquidation Proceeds Allocation"), of which amount it shall receive a cash distribution of $18,049.45 (the "All Island Liquidation Proceeds Distribution").  The $83,450.55 balance of the All Island Liquidation Proceeds Allocation allocated to All Island shall be remitted and retained by the Trustee in full and complete satisfaction of the Carve Out provided in the Interim Order and to be distributed to holders of allowed Chapter 11 administrative expenses and the U.S. Trustee Fees in accordance with the Interim Order and further order of the Bankruptcy Court.  In addition to the All Island Liquidation Proceeds Distribution, All Island shall retain (i) the funds in the account established by All Island and in the name of All Island maintained at TD Bank in which collections of accounts receivable generated post-petition and subject to

---

[3]  Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Stipulation and Order.

All Island's first priority security interests and liens pursuant to the Interim Order ("<u>All Island Secured Receivables</u>") were previously deposited, containing approximately $30,000; plus (ii) collection of any and all remaining outstanding LIB post-petition accounts receivables which are also All Island Secured Receivables, which are estimated to aggregate approximately $20,000; plus (iii) the post-petition utility deposit funded by All Island in accordance with the Interim Order in the amount of approximately $10,000 (the "<u>Utility Deposit</u>").  The automatic stay is hereby deemed lifted in favor of All Island to permit All Island to affect collection of any outstanding post-petition accounts receivables and attempt to obtain the return of the Utility Deposit. To the extent that the Trustee hereafter obtains possession of any post-petition All Island Secured Receivables or the return of the Utility Deposit, he shall promptly remit same to All Island.  In addition, the Settling Parties have agreed that All Island shall have the exclusive right to enforce its rights to retain recover on account of its remaining claims as against the 590 Premises (which is titled in the name of Brook, is not property of any of the Debtors' estates but was pledged by Brook as additional collateral for the DIP Loan).

d.    **Chapter 7 Estates**. The Debtors' estates shall receive and retain (i) $563,450.55, consisting of $83,450.55 in Carve Out monies noted above plus $480,000 in new funds carved out by the Settling Parties, plus (ii) any Liquidation Proceeds remaining in the Estate after payment of the distributions set forth in sub-paragraphs (a) through (c) above, plus (iii) any recoveries based on claims and/or causes of action under Bankruptcy Code §§ 544, 545, 547, 548, 549 or 550, under New York State's Debtor and Creditor Laws, including fraudulent conveyance laws, and Business Corporation Laws, or the proceeds thereof from any person or entity other than the non-Trustee Settling

Parties ((i), (ii), and (iii) are collectively, "Estate Recoveries"), subject to distribution in accordance with the Bankruptcy Code and further order of the Bankruptcy Court.

e.      **Confirmation of the Yaphank Property Sale**.      The Stipulation and Order are subject to approval by the Bankruptcy Court of both the Stipulation and Order and the PFT Sale.

f.      **Releases Among Settling Parties**.  Except as may be specifically set forth in the Agreement, in consideration of the mutual promises contained therein, each of the Settling Parties does hereby, on behalf of itself and each of its successors, assigns or representatives of any kind, release, waive, remit, acquit, satisfy and forever discharge each other Settling Party from any and all claims, demands, damages, debts, liabilities, obligations, contracts, agreements, causes of action, suits and costs, of whatever nature, character or description, whether known or unknown, suspected or unsuspected, anticipated or unanticipated, which any Settling Party has, may have or may hereafter have or claim to have against another Settling Party arising out of or relating to any of the Debtors or the transactions between any of the Debtors and the Settling Party, provided, however, that with the exception of any Estate Recoveries, no party shall be deemed to have released any pre-petition lien or PACA trust right in any asset not included in this Agreement or liquidated as of the date hereof.  This release includes, without limitation, all claims and causes of action arising under chapter 5 of the Bankruptcy Code and similar non-bankruptcy laws authorizing the avoidance of certain transfers.  For the avoidance of doubt, neither Hoey nor any entity in which he has an ownership interest, other than the Debtors, is being released by this Agreement.  As to All Island, the payments and rights as provided in the Stipulation and Order shall be in full and complete satisfaction of any distribution to be made to All Island from the Debtors' estates, but

16

shall not be deemed to be a release or waiver of claims asserted by All Island against the Debtors' estates.

        g.    **Scope of Settlement; Payment by Trustee**. The only matters resolved by the Settling Parties are those expressly addressed in the Stipulation and Order. Except as provided herein, the non-Trustee Settling Parties agree that the amounts distributed under the Stipulation and Order are the only monies that they will receive from the Debtors' bankruptcy estates. The rights and remedies of any Settling Party against any non-settling party are not intended to and are not waived or released, but rather, are expressly retained and preserved. The Trustee shall, in his discretion, remit payments provided under the Stipulation and Order from one or more of the Trustee's bank accounts maintained for the Debtors' estates. The Trustee further requests authority to make the payments to the non-Trustee Settling Parties under the Stipulation and Order as promptly as administratively practical.

**Stipulation and Order as Binding on Other**
**PACA Creditors Accepting a Distribution**

        47.    While substantially all of the holders of asserted PACA Claims are represented by counsel and have consented to the treatment contained in the proposed Stipulation and Order, the Trustee is presently aware of two other potential PACA creditors with claims aggregating approximately $35,000.00 who did not participate in the settlement negotiations. The bar date has passed and these are the only other claims filed in the Debtors' cases. In order to afford the closure necessary to administer and close these estates, as part of the relief requested herein, the Trustee respectfully requests that any Other PACA Creditors whose claims are not otherwise disallowed and that accept the *pro rata* share of the funds allocated by the proposed Stipulation and Order for payment of PACA Creditors be deemed bound by the terms of the Stipulation and

Order in the same form and manner as the PACA Creditors as if it had been a signatory thereto, such that they and each of them shall waive the right to seek any other distribution from the Debtors' estates. All known and potential PACA Creditors will be served with this Motion and the proposed Stipulation and Order, and the binding nature of accepting a distribution is and will be highlighted in bold in the Stipulation and Order which, if approved, will be served on all known and potential PACA Creditors.

48.    In addition, the Trustee is presently negotiating with Chapter 7 administrative professionals in an effort to reduce the aggregate amount of Chapter 7 administrative claims in an effort to "cap" such claims at approximately $430,000.00 against a total of approximately $680,000 – an anticipated voluntary reduction of nearly 37% – to permit distributions to be made to subordinated Chapter 11 administrative expenses. All holders of Chapter 7 administrative claims – including the Trustee himself – have expressed a willingness to reduce the fees and commissions they are otherwise entitled to receive (subject to Court approval).

49.    If the Trustee's negotiations are successful, it is anticipated that there would be a total of approximately $125,000 (inclusive of the $75,000.00 Carve-Out amount for the Debtors' Chapter 11 professionals), plus $8,450.55 for UST Chapter 11 fees (also from the Carve Out) available to distribute to the next priority of creditors in the Debtors' cases.

50.    Through this global collaboration and compromise of disparate creditor interests, the Trustee hopes to achieve a maximized recovery for all impacted creditors and close the Debtors' cases in an orderly and efficient manner, without further contentious and costly litigation.

### REQUEST FOR APPROVAL OF THE STIPULATION AND ORDER PURSUANT TO FRBP RULE 9019

51.    The Trustee submits that approval of the proposed Stipulation and Order is in its

best interests of the Debtors' estates and their respective creditors because the Stipulation and

Order resolves all issues relating to collection and distribution of proceeds derived from the sale

of the Debtors' assets, with a substantially reduced cost and risk to the Debtors' estates.

52.     FRBP Rule 9019(a) permits this Court to approve a compromise or settlement.

The Rule provides:

> (a)     *Compromise.*  On motion by the trustee and after notice and a hearing the
> court may approve a compromise or settlement.  Notice shall be given to
> creditors, the United States trustee, the debtor, and indenture trustees as
> provided in Rule 2002 and to any other entity as the court may direct.

53.     Neither FRBP Rule 9019 nor any section of the Code explicitly sets forth the

standards by which a court is to evaluate a proposed settlement for approval.  The standards for

approval of settlements in bankruptcy cases are well established in the case law, however, and

focus upon whether the proposed settlement is reasonable and in the best interests of creditors.

*See Protective Committee v. Anderson*, 390 U.S. 414 (1968), *reh'g denied,* 391 U.S. 909 (1968).

54.     In deciding whether a proposed compromise is fair and equitable, reasonable and

in the best interests of creditors, courts in the Second Circuit follow the analysis first articulated

by the Supreme Court in *Anderson*, as developed and applied as the case law.  Thus, courts assess

a proposed settlement based upon a consideration of some or all of the following factors:

> (i)     the relative benefits to be received by creditors under the proposed
> settlement;
>
> (ii)    the likelihood of success in the litigation compared to the present and
> future benefits offered by the proposed settlement;
>
> (iii)   the prospect of complex and protracted litigation if settlement is not
> approved;
>
> (iv)    the attendant expense, inconvenience and delay of litigation;
>
> (v)     the probable difficulties of collecting on any judgment that might be
> obtained;

> (vi)    the competency and experience of counsel who support the proposed settlement;
>
> (vii)   the extent to which the settlement is the product of arm's-length bargaining, and not the product of fraud or collusion;
>
> (viii)  the nature and breadth of any releases to be issued as a result of the proposed settlement; ;and
>
> (ix)    the paramount interest of the creditors and proper deference to their reasonable views.

*See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 427 (S.D.N.Y. 1993); *In re Purified Down Products Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993); *In re International Distribution Centers, Inc.*, 103 B.R 420, 422 (S.D.N.Y. 1989); *In re Fugazy*, 150 B.R. 103,106 (Bankr. S.D.N.Y. 1993); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 506 (Bankr. S.D.N.Y. 1991); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 287 (Bankr. S.D.N.Y. 1990); *In re Texaco, Inc.*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988); *In re Lion Capital Group, Inc.*, 49 B.R. 163, 175 (Bankr. S.D.N.Y. 1985); *In re Carla Leather, Inc.*, 44 B.R.457, 466 (Bankr. S.D.N.Y. 1984), *aff'd* 50 B.R. 764 (S.D.N.Y. 1985); *In re W.T. Grant Co.*, 4 B.R. 53,69 (Bankr. S.D.N.Y.). *aff'd,* 20 B.R. 186 (S.D.N.Y.), *aff'd,* 699 F. 2d 599 (2d Cir. 1983), *cert. denied sub nom. Cosoff v. Rodman*, 464 U.S. 822 (1983). *See also In re Jackson Brewing Co.*, 624 F. 2d 599, 602 (5th Cir. 1980).

55.    In evaluating the propriety of a settlement pursuant to the foregoing factors, the court need not conduct a trial, "mini-trial," or "a rehearsal of the trial" on the merits to actually resolve the extant factual and legal issues, but must simply consider whether against the background of those issues, the settlement is reasonable. *Newman v. Stein*, 464 F. 2d 689, 692 (2d Cir. 1972), *cert. denied sub nom., Benson v. Newman*, 409 U.S. 1039 (1972). *See also International Distrib. Ctrs.*, 103 B.R. at 423; *Drexel Burnham*, 134 B.R. at 496 (rather than being forced to decide all questions of law or fact that are to be settled, the court must canvass the issues

to determine that the settlement falls above the "lowest point in the range of reasonableness").  In so doing, the court may consider the settlement in the context of its familiarity with the history of the case, the complexity of the claims alleged, the parties, and the context in which the claims and the settlement arose.  *See Anderson*, 390 U.S. at 444; *Purified Down Products*, 150 B.R. at 519, 524; *International Distrib. Ctrs.*, 103 B.R. at 423.

56.    The settlement evaluation process is not designed to substitute the court's judgment for that of a trustee.  *Carla Leather*, 44 B.R. at 465.  While the Court is not expected to "rubber stamp" a proposed settlement, the Court should give considerable weight to the informed judgment of the trustee that the compromise is fair and equitable.  *See Anderson*, 390 U.S. at 444; *Ionosphere*, 156 B.R. at 426; *International Distrib. Ctrs.*, 103 B.R. at 423; *Drexel*, 134 B.R. at 496; *Carla Leather*, 44 B.R. at 472.  As articulated by the district court in *International Distribution Centers*, the Court should give weight to the support not only of the trustee's counsel but of other counsel to a settlement in determining the wisdom of the compromise.  *International Distrib. Ctrs.*, 103 B.R. at 423.

57.    Here, the Trustee and the other Settling Parties extensively negotiated the proposed Stipulation and Order at arms' length and have determined that the Stipulation and Order is fair and reasonable for several reasons.  First, the Stipulation and Order resolves complex issues relating to priority and amount of claims against the Debtors, with minimal cost and risk to Debtors' estates.

58.    Second, in addition to reducing various asserted secured, statutory priority and super-priority claims asserted against the Debtors, the Stipulation and Order results in a recovery to the Estates aggregating approximately $563,450.55, including $480,000 in new funds carved out by the competing creditor constituencies and $83,450.55 from the Carve Out for UST fees and Chapter 11 administrative professional claims, as noted above.  The Trustee believes this recovery is a fair and equitable return. For example, but for the proposed agreed-upon reduced distributions

21

contained in the Stipulation and Order, Chapter 11 administrative professionals would likely be relegated to receiving only a pro rata share of Carve-Out agreed to by All Island in connection with its DIP Loan.  Here, the Stipulation and Order ensures a greater return to Chapter 11 creditors, net only of Chapter 7 Administrative Claims, which various parties, including the Trustee, Maltz and the Trustee's other administrative professionals have also agreed to voluntarily reduce.  In addition, the Stipulation and Order maximizes the recovery to Debtors' estates by eliminating the inherent risks and the administrative costs of litigating the various issues asserted by and among competing creditors.

59.    It is readily apparent, based on the complexity and size of the competing claims and interests and the legal arguments propounded by the Settling Parties, that complex and protracted litigation will ensue if the settlement is not approved.  The likelihood of success in that litigation compared to the benefits offered by the proposed settlement strongly favor approval of the proposed settlement.  It is certain that the Trustee and the Debtors' estates would incur very substantial expenses in any effort to challenge and prevail against the competing claims, without any assurance that any monies recovered on behalf of the Debtors' estates and their creditors would exceed the expense of the litigation.

60.    It is equally apparent that the competing claims and interests of the non-Trustee Settling Parties against each of the Debtors' estates would, if allowed or recognized, exceed the asset liquidation proceeds of each of the Debtors' estates, leaving little or nothing to satisfy Chapter 7 administrative expenses and eliminating any recoveries for any other creditors or claimants.

61.    For the foregoing reasons, Debtor submits that approval of the Stipulation and Order is in the best interests of Debtor and its estate since (a) the Stipulation and Order effectively resolves disputed claims and issues among various constituencies, (b) the Debtors' estates will avoid the costs and time delay which would be associated with further protracted litigation and

discovery; and (iii) the Trustee believes that the consideration given by all parties in the Stipulation and Order is fair and reasonable and inures to the benefit of each of the Debtors' estates.

## REQUEST FOR HEARING ON SHORTENED NOTICE

62.     As indicated above, approval of the sale of the Yaphank Property is integral to approval of the proposed Stipulation and Order and a hearing has been adjourned to May 13, 2015.   As a result, pursuant to section 102(1) of the Bankruptcy Code and Bankruptcy Rules 9006(c)(1) and 9013, the Trustee submits that having a hearing on this Motion on shortened notice at the same time, *i.e.,* May 13, 2015, will provide reasonable and sufficient time under the facts and circumstances of these cases for consideration of both confirmation of the results of the Auction Sale and approval of the Stipulation and Order.

## NOTICE

63.     The Trustee proposes to provide notice of the Motion as follows: (a) by overnight delivery and/or electronic transmission upon: (i) the Office of the United States Trustee for the Eastern District of New York, Long Island Federal Courthouse, 560 Federal Plaza, Room 560, Central Islip, New York 11722-4437, Attn.: Alfred M. DiMino, Esq.; (ii) all parties who have filed a Notice of Appearance in the Debtors' cases; and (iii) the twenty (20) largest unsecured creditors to the extent not already served through counsel via (a)(ii) above; and (b) via first class mail on all other creditors in the Debtors' cases.   The Trustee submits that said notice is adequate and proper under the circumstances.

## CONCLUSION

64.     These have been complicated and contentious cases, but the proposed Stipulation and Order will resolve a myriad of disputes and provide the best possible return to the estates and their creditors.   It is also a testament to the professionalism of the parties involved, who each compromised their various positions and assertions as against the Debtors in order to achieve a

global settlement and facilitate the orderly administration of these cases. In light of the foregoing, the Trustee respectfully submits that the settlement embodied in the Stipulation and Order falls well above "the lowest point in the range of reasonableness" and is in the best interests of the estates at large and should, therefore, be approved in its entirety.

65.    No previous application for the relief herein requested has been made to this or any other Court.

**WHEREFORE,** the Trustee respectfully requests that the Court (i) approve and enter the proposed Stipulation and Order; (iii) hear this Motion on shortened notice together with confirmation of the sale of the Yaphank Property; and (iv) grant such other and further relief as is just and proper under the circumstances.

Dated: Uniondale, New York
April 27, 2015

WESTERMAN BALL EDERER
MILLER ZUCKER & SHARFSTEIN, LLP


By:    */s/ Thomas A. Draghi*
Thomas A. Draghi, Esq.
1201 RXR Plaza
Uniondale, New York 11556
(516) 622-9200

01153161.DOC